No. 89,578

In the Matter of the Appeal of ANR PIPELINE COMPANY from a Decision of the Director of Property Valuation of the State of Kansas.

(79 P.3d 751)

Opinion filed November 7, 2003.

*Richard D. Greene*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Karen L. Pauley*, of El Paso Corporation, of Houston, Texas, was with him on the briefs for appellant.

*William E. Waters*, of the Kansas Department of Revenue, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: ANR Pipeline Company (ANR) appeals from a Board of Tax Appeals' (BOTA) decision regarding the value of its interstate company or its unit value for the years 1994 and 1995. ANR claims its unit value was overvalued because (1) sufficient consideration was not given to the Federal Energy Regulatory Commission (FERC) Order 636 in forecasting ANR's future income, (2) intangible assets not subject to tax in Kansas were included in the unit values, and (3) BOTA's adoption of overall capitalization rates were not supported by the weight of evidence. ANR also claims that BOTA applied an erroneous standard of review by giving deference to the Department of Revenue Property Valuation Division (PVD). For the reasons stated in this opinion, we affirm BOTA's decision.

This appeal deals with BOTA's determination of the value of ANR's entire operation or unit value. That value was determined primarily through an income approach. The cost approach was also used as well as the market approach. However, less weight was given to the market approach since ANR had no publically traded stock. The income approach utilizes a formula to arrive at value where value equals income, divided by a capitalization rate. The dispute in this case involves both the income and the capitalization rate components of the formula. BOTA correctly identified the issues:

"A. [What was] [t]he appropriate unit valuation of the Taxpayer's property for 1994 and 1995 tax years, including:

a. The use of income forecasts in the income approach.

b. The appropriate capitalization rate, including the appropriate cost of equity[?]

"B. Were the values of nontaxable intangibles included in the unit valuation for the tax years 1993, 1994, and 1995[?]"

Before considering the merits of ANR's claims as to BOTA's determination of unit values, we must determine a threshold issue of whether BOTA applied the correct standard of review in its decision. We also must determine our standard of review.

## BOTA'S STANDARD OF REVIEW

It is the duty of BOTA, in reviewing a valuation by the PVD, to exercise its judgment anew based on the evidence presented to it at the hearing and without giving deference to the PVD's valuation. *In re Tax Appeal of Colorado Interstate Gas Co.*, 270 Kan. 303, 14 P.3d 1099 (2000). In a prior appeal of this same case, we reversed and remanded to BOTA based upon our conclusion that BOTA may have given the PVD deference and based upon our decision in *Colorado Interstate Gas,* we rejected the standard adopted by BOTA that a public utility must demonstrate that the PVD intentionally and grossly disregarded the standards prescribed by K.S.A. 79-5a04 in order to prevail. While BOTA did not articulate such a standard in this case, we held that it was not possible to conclude that BOTA disregarded the erroneous standard of review adopted in *Colorado Interstate Gas.* We, therefore, reversed and remanded to BOTA for further proceedings. After a review of the law in Kansas regarding the appropriate standard BOTA must use in its determination of value in a public utility's appeal from a PVD determination of value, we said in *Colorado Interstate Gas:*

"Based upon the expert testimony presented by the PVD before BOTA that the unit valuation method used need not represent the fair market value of CIG's property in Kansas, and considering that BOTA applied an incorrect standard of review for that evidence by giving deference to the PVD's determination of value, there is a real possibility that BOTA's final determination of value for the years in question was not based on fair market value as required by K.S.A. 79-5a04." 270 Kan. at 321.

In the present appeal, ANR again challenges the standard of review applied by BOTA, claiming that BOTA paid lip service to the standard of review set forth in *Colorado Interstate Gas* but effectively applied a similarly erroneous standard by again giving deference to the valuation determined by the PVD. In support of its claim, ANR points to the following language in the BOTA decision:

"38. The Taxpayer has the burden of proof to show by a preponderance of the evidence that the Director has not appropriately valued the Taxpayer's property pursuant to K.S.A. 79-5a04. *Id.*

. . . .

"41. The Board finds that PVD used appropriate methodologies and came to rational conclusions concerning depreciation and obsolescence in the cost approaches to value.

. . . .

"47. PVD's overall capitalization rate for tax years 1994 and 1995 are similar to the overall capitalization rates recommended by the Natural Gas Pipeline Property Tax Forum. Finally, PVD's capital structure determination is similar to the capital structure determination of the Natural Gas Pipeline Property Tax Forum.

. . . .

"53. The Board finds that the Taxpayer has not shown by a preponderance of the evidence that PVD's unit valuation of the Taxpayer's property is in error. After considering the standards prescribed by K.S.A. 79-5a04, the Board concludes that PVD's unit valuation of the Taxpayers property for tax year 1993 of $1,640,000,000, for 1994 of $1,590,000,000 and for tax year 1995 of $1,560,000,000 are appropriate estimates of the fair market value of the Taxpayer's property and should be sustained."

ANR argues that the above language makes clear that BOTA once again gave deference to the PVD and required ANR to shoulder the burden of proving that the PVD erred. ANR notes that it should have no burden to show that the PVD erred or to negate the contentions of the PVD, but argues that its burden is limited to showing by a preponderance of evidence that its proposed values are correct. We agree that ANR's burden before BOTA was to establish by a preponderance of evidence that its proposed values are correct. We, however, disagree that BOTA actually deferred to the PVD in its decision on the unit value of ANR's property and the fair market value of its property in Kansas.

Following remand, the proceeding continued with an agreement by the parties to consider the matter based upon the existing record. At that point, the record contained the PVD's determinations as to ANR's value together with all supporting evidence in addition to ANR's determination of its value together with its supporting evidence. In order to prevail before BOTA, the burden fell upon ANR to establish by a preponderance of the evidence the accuracy of its valuation. BOTA recognized its role when it said that ANR "has the burden of proof to show by a preponderance of the evidence that the [PVD] has not appropriately valued the Taxpayer's [ANR] property pursuant to K.S.A. 79-5a04." In other words,

ANR's burden was to show that the PVD was wrong and the value ANR asserted was supported by substantial competent evidence. Thus, BOTA was giving no deference to the PVD except to say that when the PVD established evidence supporting its valuation, ANR must necessarily attack and undermine the PVD's valuation. It is up to BOTA—by paying neither side deference—to determine which side presents the most compelling case.

ANR argues that Paragraph 38, quoted above, shows how BOTA deferred to the PVD's judgment. Within this context, BOTA's statement that the taxpayer has the burden of proof to show by a preponderance of the evidence that the director has not appropriately valued and allocated the valuation, as prescribed by K.S.A. 79-5a04, is another way of saying that the burden lies with ANR. In order for ANR to prove its valuation, it would be reasonably required to prove that the PVD valuation was incorrect.

ANR also complains that evidence of BOTA deference is found in Paragraph 41, where BOTA said that the PVD came to rational conclusions. However, BOTA also said in the same sentence that the PVD's methodologies were appropriate. Consistent with exercising judgment anew, it would be logical for BOTA to adopt conclusions that were rational and reached by appropriate methodologies.

ANR argued that because the PVD's overall capitalization rates and capital structure determinations in Paragraph 47 above are similar to that recommended by the Natural Gas Pipeline Property Tax Forum (Property Tax Forum), BOTA deferred to the PVD. However, it must be noted that ANR was a member of the Property Tax Forum and a member of the subcommittee recommending overall capitalization rates for the years 1994 and 1995 as more fully discussed below. Far from indicating a deference to the PVD, it demonstrates that BOTA, like the PVD, considered the Property Tax Forum a valuable resource for determining overall capitalization rates, especially since the capitalization rates determined by a subcommittee of the Property Tax Forum were recommended to all members including ANR.

In Paragraph 53, when BOTA said in its original order on remand that ANR has not showed "by a preponderance of the evi-

dence that the PVD's unit valuation of Taxpayer's property is in error," BOTA was also saying that the PVD had shown by a preponderance of evidence that its valuation was correct. Unlike the previous appeal, there is no indication that BOTA relied on an intentional and gross disregard standard of review or otherwise deferred to the PVD in determining the unit value of ANR's property. See *Colorado Interstate Gas*, 270 Kan. at 315.

BOTA understood the mandate of this court in *Colorado Interstate Gas* and applied a correct standard of review as demonstrated in its order denying ANR's motion for reconsideration:

"4. The Taxpayer asserts that the Board did not exercise its judgment anew, but instead, found that the Taxpayer did not meet its burden to show that the Director has not appropriately valued the subject property. The Taxpayer further argues that the Board's standard of review inherently gives deference to the Director's valuation in direct contravention of the Supreme Court's remand. The Board believes the Taxpayer has misinterpreted the Board's findings and conclusions.

"5. The Board is well aware that the standard of review requires that the Board exercise its judgment anew based on the evidence presented and without giving deference to the Director's valuation. The Taxpayer's argument in these matters is basically that the Director has excessively valued and allocated the valuation of the Taxpayer's property. The Taxpayer must provide evidence to show that the Director's valuation is in error and the Director must provide evidence in support of his valuation. The Board must review the evidence provided and by applying the factors enumerated in K.S.A. 79-5a04 determine the appropriate valuation of the Taxpayer's property. In these matters, the Board gave no deference to the Director's valuations, but rather reviewed the evidence presented and concluded by the weight of the evidence that the appropriate unit valuation for 1993 is $1,640,000,000, for 1994 is $1,590,000,000, and for 1955 is $1,560,000,000, which are the same as determined by the Director."

Nevertheless, ANR argues that a decision on whether BOTA applied the correct standard of review should be determined by considering the record as a whole, not by considering what BOTA said in its order denying reconsideration. Further, ANR argues that BOTA's order denying reconsideration does not negate the admissions of deference in BOTA's original order since BOTA's figures matched those of the PVD's despite the subjective nature of the judgment exercised by the PVD.

The fact that BOTA's figures matched those of the PVD's provides little if any evidence that BOTA applied a deferential standard of review. ANR is right that this determination must be made from the record as a whole. If BOTA is to be believed, it gave no deference to the PVD in its determination of value. However, we must point out that initially it was the responsibility of the PVD to value ANR's property for ad valorem taxation in Kansas. It did so based upon the judgment of its experts and all of the factors which are now before this court. The proceeding before BOTA started with the PVD's determination of value and its contention before BOTA that the unit value as well as the fair market value in Kansas was established. The assessment had been made by the PVD. Before BOTA, both the PVD and ANR presented their cases regarding the testimony of unit value as well as the fair market value of ANR's property in Kansas. BOTA decided this case based upon all the evidence without giving deference to the PVD.

ANR had the burden to establish that its unit value was correct, thereby establishing that the determination by the PVD was invalid based upon the record as a whole. BOTA concluded that ANR failed to meet its burden, thus providing a basis for concluding based upon all evidence presented that the valuation determined by the PVD was correct. Instead of giving deference to the PVD by adopting its valuation, BOTA determined that the record supported the determination made by the PVD. To say that BOTA adopted the PVD's values without any consideration of the evidence ignores the record as a whole as well as BOTA's expressed conclusion that its determination was made anew based upon all the evidence presented.

## STANDARD OF REVIEW OF BOTA DECISIONS

In reviewing a BOTA decision, several well-established principles govern. BOTA is a specialized agency and is considered to be the paramount taxing authority in this state. *Wirt v. Esrey*, 233 Kan. 300, 314, 662 P.2d 1238 (1983). BOTA is a specialized agency that exists to decide taxation issues. *Hixon v. Lario Enterprises, Inc.*, 257 Kan. 377, 378-79, 892 P.2d 507 (1995). Its decisions are given great weight and deference when it is acting in its area of

expertise. *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, 515, 930 P.2d 1366 (1997). The party challenging BOTA's decisions has the burden to prove that the action taken was erroneous. *Board of Ness County Comm'rs v. Bankoff Oil Co.*, 265 Kan. 525, 537, 960 P.2d 1297 (1998). However, if BOTA's interpretation of law is erroneous as a matter of law, appellate courts will take corrective steps. *In re Tax Appeal of Family of Eagles, LTD*, 275 Kan. 479 Syl. ¶ 1, 66 P.3d 858 (2003).

Orders of BOTA are subject to judicial review under the Act for Judicial Review and Civil Enforcement of Agency Actions. See K.S.A. 77-601 *et seq.*; K.S.A. 74-2426(c); *In re Appeal of Topeka SMSA Ltd. Partnership*, 260 Kan. 154, 162, 917 P.2d 827 (1996). In reviewing BOTA decisions, this court determines whether relief is warranted under the provisions of K.S.A. 77-621(c), which provides:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

"Arbitrary or capricious" may be established under K.S.A. 77-621(c)(8) where an administrative order is not supported by substantial evidence. *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 365, 770 P.2d 423 (1989). "Substantial evidence is evidence which possesses both relevance and substance so as to form a basis of fact from which the issues can be reasonably resolved. [Citation omitted.]" *Dalmasso v. Dalmasso*, 269 Kan. 752, 758, 9 P.3d 551 (2000).

## FACTS

There is little agreement between the parties as to the material facts of this case. Since we are called upon to review the BOTA decision, we begin with BOTA's statement of facts, leaving the factual arguments of the parties to the analysis portion of this opinion.

The BOTA order on remand sets forth the following factual findings:

"4. On remand, the parties have agreed that additional evidence is not necessary and that the Board should review the evidence previously presented and issue a decision utilizing the standards set forth by the Supreme Court in remanding these matters and in remanding the Colorado Interstate Gas cases. The following issues are before the Board:

. . . .

"4. [Paragraph misnumbered.] At the January 1997 hearing of these matters the following individuals testified:

Called as witnesses by the Taxpayer:

| | |
|---|---|
| John C. Goodman | ASA, PE, Appraiser with AUS Consultants |
| Kenneth Williams | Vice-Chairman, Brown, Williams, Scarbrough & Quinn, Inc., Consulting |
| Prof. J. Peter Williamson | The Laurence F. Whittemor Professor of Finance, Amos Tuck School of Business, Dartmouth College |
| Dr. John H. Davis, II | PhD, MAI, SRPA, ASA, Business Valuation |
| Floyd Rumsey | Supervisor, Utility Section, State Appraised Properties, Division of Property Valuation, Kansas Dept. of Revenue |

Called as witnesses by the Division of Property Valuation:

| | |
|---|---|
| Michael W. Goodwin | CAE, ASA, Michael W. Goodwin & Associates |
| Dr. A. James Ifflander | PhD, CFA, Private Consultant |
| John Hughes | Tax Examiner 4, Division of Property Valuation, Kansas Dept. of Revenue |
| Floyd Rumsey | Supervisor, Utility Section, State Appraised Properties, Division of Property Valuation, Kansas Dept. of Revenue. |

"5. At the outset of the January 1997 hearing, Taxpayer withdrew all issues regarding unit valuation of the Taxpayer's operating properties for tax year 1993 and accepted the Director's unit valuation with the exception of an issue regarding deduction of intangibles. Therefore, the only issue before the Board for the 1993 tax year involves the Director's treatment of intangibles.

"6. The primary issue before the Board for the 1994 and 1995 tax years is that fair market value (unit valuation) of the Taxpayer's operating properties. The Taxpayer is not raising any issues concerning the Director's allocation of the unit valuation to Kansas pursuant to K.S.A. 79-5a04, nor the Director's apportionment pursuant to K.S.A. 79-5a25 of the assessed valuation to the taxing units in Kansas where the Taxpayer has property located.

"7. The Taxpayer has also raised a number of constitutional issues. The Board does not have the authority to determine whether these arguments have merit. The Board is to presume that the Kansas Constitution does not violate the federal constitution and that the Kansas statutes do not violate the U.S. Constitution or Kansas Constitution. The Board has no authority to determine constitutional questions. *Zarda v. State,* 250 Kan. 364, 826 P.2d 1365, *cert denied,* 504 U.S. 973, 119 L. Ed. 2d 566, 112 S. Ct. 2941 (1992). Therefore, the Taxpayer's constitutional arguments will not be addressed.

## "FINDINGS OF FACT

"8. The Taxpayer's common equity is owned 100% by American Natural Resources Company, which in turn is owned 100% by Coastal Natural Gas Company, which is owned 100% by The Coastal Corporation. Coastal is a diversified energy company that derives approximately 30% of its revenues from natural gas transmissions investments, which include the Taxpayer and several other pipeline properties or interests.

"9. The Taxpayer owns and operates an interstate natural gas pipeline system consisting of more than 12,000 miles of pipeline which provides storage, transportation, and balancing of natural gas for customers through its facilities in 18 states, including Kansas. Taxpayer Exhibits 20, 21, 30, pp. 2, 8, & 113, pp. 2-3. The Taxpayer transports gas from sources in the West and Southeast to markets in the upper Midwest area including portions of Wisconsin, Michigan, Illinois, Indiana and Ohio.

"10. The Taxpayer is a natural gas company as defined by the Natural Gas Act. 15 U.S.C. § 717(c). The Taxpayer is regulated by the Federal Energy Regulatory Commission ('FERC'), which exercises preemptive jurisdiction over nearly all of Taxpayer's interstate natural gas transmission, storage and gathering business activities.

"11. FERC establishes 'just and reasonable' rates for the Taxpayer's services based upon the costs and expenses associated with operating and maintaining the pipeline with allowance of a reasonable return on the Taxpayer's investment.

"12. 'Rate Base' is the measure for establishing the investment upon which the Taxpayer can earn a return. Rate base consists of the original cost of facilities, less accumulated depreciation, less deferred taxes, plus working capital allowance.

"13. In May of 1992, FERC issued Order 636, which required a dramatic restructuring of the entire natural gas industry. Transcript at 82. Effective in November of 1993, FERC Order 636 changed the business environment for the Taxpayer by unbundling the several functional operations of the Taxpayer, pro-

viding for capacity release and implementation of straight-fixed variable price contracting and providing for increased competition. While FERC Order 636 provided opportunities for competition, it also provided other business opportunities for the Taxpayer.

"14. Prior to full implementations of FERC Order 636, the Taxpayer consistently earned more than its allowed rate of return.

"15. The restructured environment and increased risks had a tendency to drive downward the rates that pipelines were able to charge for the remaining unbundled services. The opportunity for pipelines to earn anything over and above allowed return was capped. The result was to move pipelines, like the Taxpayer, who had been earning more than the allowed rate of return, down to an earnings ceiling of rate base times allowed rate of return.

"16. The effects of FERC Order 636 have been more severe on the Taxpayer due to its previous performance, and its highly competitive market position in the upper Midwest.

"17. The effects of FERC Order 636, and specifically how the Order would negatively impact the future earnings of the Taxpayer, was generally known on January 1, 1994, and January 1, 1995. A willing buyer on such dates would have taken into consideration the anticipated effects.

"18. As of the assessment date for tax year 1994, the Division of Property Valuation (hereinafter referred to as 'PVD') had been studying the impact of FERC Order 636 for at least 18 months. PVD was generally aware at this time that the Order had dramatically changed the natural gas industry, had introduced increased competition in each segment of the business, had forced discounting and rate structures that would mean loss of revenues, and had given rise to significant regulatory uncertainty.

"19. In meetings between the Taxpayer and PVD in 1994 and in 1995, the Taxpayer reiterated the negative impact of FERC Order 636 on its business. Specifically, he Taxpayer told PVD that its business was changing, that net book cost had become a ceiling on its value, and that earning would be driven to rate base times rate of return.

"20. However, the Taxpayer was unable to define when the full effect of FERC Order 636 would be felt by the Taxpayer, and what its financial impact would be as a whole.

"21. The experts generally agreed that the three indicators of the unit value of a utility's operating properties to be considered are the cost approach, the income approach, and the stock and debt approach.

"22. The correlated unit values assessed by PVD for the year at issue were higher than any of the value indicators relied upon by PVD. Specifically,

1994 (See Exhibit PV 4a)

| | |
|---|---|
| Book O.C. Less Depreciation (net book cost) | $1,244,964,466 |
| Reproduction Cost Less Depreciation | $1,587,428,288 |
| Stock & Debt | $1,141,600,578 |

| | |
|---|---|
| Income Approach | $1,581,352,709 |
| Correlated Unit Value | $1,590,000,000 |
| | |
| 1995 (See Exhibit PV 5a) | |
| Book O.C. Less Depreciation (net book cost) | $1,237,050,141 |
| Reproduction Cost Less Depreciation | $1,471,630,589 |
| Stock & Debt | $1,553,369,978 |
| Income Approach | $1,555,120,383 |
| Correlated Unit Value | $1,560,000,000 |

## "COST APPROACH

"23. The cost approach is considered reliable because it is the principal determinant of a regulated pipeline's earnings capability and is not contaminated by the vagaries of the more simplistic direct capitalization model or the likelihood of including intangibles unrelated to the operating properties.

"24. The net book cost indicators developed by the experts herein are as follows:

For tax year 1994:

| | |
|---|---|
| PVD | $1,244,964,466 |
| Goodman | $1,184,100,000 |
| Davis | $1,073,411,000 |
| Goodwin/Ifflander (Goodman critique) | $1,243,924,000 |
| Goodwin/Ifflander (Davis critique) | $1,243,922,974 |

For tax year 1995:

| | |
|---|---|
| PVD | $1,237,050,141 |
| Goodman | $1,106,600,000 |
| Davis (1) | $1,064,112,000 |
| Davis (2) | $1,233,343,000 |
| Goodwin/Ifflander (Goodman critique) | $1,236,272,000 |
| Goodwin/Ifflander (Davis critique) | $1,236,271,551 |

"25. Economic obsolescence is a question of fact to be determined and is not an automatic deduction in the cost approach. PVD did take into consideration economic obsolescence. However, PVD did not adjust its net book cost indicators for additional economic obsolescence over and above what was allowed by FERC because FERC captures all of the depreciation and obsolescence there is for the company through their depreciation rates.

"26. PVD deducted for obsolescence in its trended cost approach.

"27. The book original cost of the Taxpayer's assets in 1994 was $3,317,712,832. The Net Book Cost value derived by PVD for 1994 was $1,244,964,466 and the Reproduction Cost Less Depreciation value was $1,587,428,288. The book original cost of the Taxpayer's assets in 1995 was $3,467,499,782. The Net Book Cost

Value derived by PVD for 1995 was $1,237,050,141 and the Reproduction Cost Less Depreciation value was $1,471,630,589.

### "INCOME APPROACH

"28. The essential elements necessary to develop the income indicator of value for a public utility's operating properties are a correct income forecast and an appropriate capitalization or discount rate. Failure to forecast correctly the future income or failure to apply the correct capitalization or discount rate will result in substantial errors in valuation.

"29. PVD and its experts relied exclusively on historic income in the development of income to be capitalized. PVD admits that if an appraiser has reason to believe that income will decline into the future, even though it has not yet happened, this has to be taken into account in order to avoid over-valuation. A well-informed buyer would adjust the purchase price to reflect declining future income. Even though PVD relied on historic income, PVD reviewed market place income, betas, and bond ratings in an attempt to determine the effect, if any, of FERC Order 636 on large natural gas transmission companies in future years.

"30. PVD for the years at issue herein used the same practices and procedures and capitalization rate for all large natural gas transmission companies.

"31. Generally accepted appraisal proceedings require that income to be capitalized must be a forecast of future earnings to the best of the appraiser's judgment. Failure to consider future income contradicts the principle of anticipation, which holds that value is the present worth of future benefits.

"32. The Taxpayer's income pattern on the assessment dates was known and stable. None of the traditional income projection techniques used by PVD, its experts or the Taxpayer's experts, discerned any significant declines in income from the existing data. Even after all of the Taxpayer's assumptions regarding Order 636, PVD capitalized the correct income.

"33. The principal disparity between PVD and the Taxpayer's appraisers in the selection of an overall capitalization or discount rate is the appropriate cost of equity. The evidence of the cost of equity can be summarized as follows:

For tax year 1994:

| | |
|---|---|
| PVD | 11.75% |
| Goodman | 13.65% |
| Davis | 13.45% |
| Goodwin/Ifflander DGM 'Cashflow' | 13.56% |
| Industry Study | 13.47% |
| Williamson | 14.50% |

For tax year 1995:

| | |
|---|---|
| PVD | 12.50% |
| Goodman | 14.90% |

| | |
|---|---|
| Davis | 14.70% |
| Goodwin/Ifflander DGM 'Cashflow' | 14.10% |
| Industry Study | 14.33% |
| Williamson | 15.25% |

### "STOCK AND DEBT APPROACH

"34. The stock and debt approach is a generally recognized appraisal methodology. However, it is of questionable reliability when the subject operating properties are not owned by a corporation whose stock is publicly traded. The Taxpayer's common equity is not publicly traded. The parties agreed that the stock and debt approach should not be given much weight in arriving at the unit valuation of the Taxpayer's property.

### "INTANGIBLES

"35. The Taxpayer's books and records as audited by FERC, reflect the detailed original cost of capital expenditures for installation costs incurred in Kansas during 1991 and 1992. The Taxpayer argues that these costs are nontaxable intangibles that should be removed from the unit valuation."

## DISCUSSION AND ANALYSIS

## DID BOTA ERR BY FAILING TO CONSIDER THE FORECAST OF ANR'S FUTURE INCOME IN LIGHT OF FERC ORDER 636?

ANR argues that BOTA erred because it failed to base its valuation upon a forecast of future income. According to ANR the failure to forecast future income violated the principle that valuation should be determined by using the well-informed buyer standard and the principle that generally accepted appraisal procedures should be used. Finally, ANR claims that BOTA's stated reasons for not using future income forecasts in its valuation are inadequate.

ANR would have this court apply an unlimited standard of review and determine that BOTA's income determination was erroneous as a matter of law because it was based on historical income data instead of forecasted future income. However, BOTA did not base its determination solely on historical data but considered other evidence regarding ANR's future income that ANR would like to ignore. The question we must resolve is whether BOTA's determination of ANR's income is supported by substantial competent evidence; thus, our standard is not unlimited.

BOTA recognized the shortcomings of the PVD's determination and that the income approach to value depends upon a forecast of future income:

"29. PVD and its experts relied exclusively on historic income in the development of income to be capitalized. PVD admits that if an appraiser has reason to believe that income will decline into the future, even though it has not yet happened, this has to be taken into account in order to avoid over-valuation. A well-informed buyer would adjust the purchase price to reflect declining future income. Even though PVD relied on historic income, PVD reviewed market place income, betas, and bond ratings in an attempt to determine the effect, if any, of FERC Order 636 on large natural gas transmission companies in future years.

"30. PVD for the years at issue herein used the same practices and procedures and capitalization rate for all large natural gas transmission companies.

"31. Generally accepted appraisal procedures require that income to be capitalized must be a forecast of future earning to the best of the appraiser's judgment. Failure to consider future income contradicts the principle of anticipation, which holds that value is the present worth of future benefits.

"32. The Taxpayer's income pattern on the assessment dates was known and stable. None of the traditional income projection techniques used by PVD, its experts or the Taxpayer's experts, discerned any significant declines in income from the existing data. Even after all of the Taxpayer's assumptions regarding Order 636, PVD capitalized the correct income."

John H. Hughes II, the expert appraiser for the PVD, did the actual valuation of ANR's property on January 1, 1994, and January 1, 1995. He learned of FERC Order 636 and considered in great detail its impact on the industry as a whole as well as its impact on ANR. He acknowledged that FERC Order 636 caused great uncertainty because there was uncertainty when or how it might impact the natural gas pipeline companies. He considered stock betas, which are a good measure of risk. Betas measure the volatility of a particular stock compared to the stock market as a whole. Hughes testified that he "did not see a major change in [the] beta[s] for the industry," meaning that the market was not predicting a negative impact on those corporations affected by FERC Order 636.

He also examined the bond ratings of the large natural gas pipeline companies and found no significant changes as a result of FERC Order 636. He examined the large natural gas pipeline companies' own capitalization rate study to see if the industry itself was signaling increased risk to the income streams. He found no trends

in the industry's own recommended capitalization rates indicating that they perceived that the future incomes of the large natural gas pipeline companies were at risk as a result of FERC Order 636.

Hughes examined ANR's reported incomes to see if they had significantly declined in 1993. He found that ANR earned $185,364,501 in 1993 and $183,539,635 in 1994, representing a less that 1% decline in ANR's incomes from 1993 to 1994, which did not signal a risk to ANR's future income stream. Hughes concluded:

"There was no indication in the marketplace that we could see at that time showing that their incomes were actually, were not dropping, their bond ratings didn't change, you know, whatever betas hadn't changed. I mean, the industry as a whole, everybody in that market did not show—there's some companies that incomes were going up, some companies, incomes were going down. There was no actual pattern or trend to be found.

. . . .

"Q. [By Presiding Officer Goering] But if I hear you right, what you're saying is we had no hard numbers to rely on to, to be sure that that prediction would in fact occur based on what Mr. McKelvy [sic] was telling you at the valuation, during the valuation proceedings?

"A. Right, we had no numbers—you know, I guess in preface, it started in '92 [FERC Order 636] that, you know, 636 was going to change, our incomes are going to go down. By the time we hit the '95 year and their income hadn't dropped one percent of the three years of hearing this that it's going to go down, it looked to us that 636 was actually going to decrease ANR's income. As an industry as a whole the incomes were probably up for the same two year period. You know, numbers wise there was no actual, for '95, to show it, even though, you know, it's out there and it's possible and it's said, there's no way to quantify it and I don't believe there still is today.

"Q. And I understand your position and respect that very much. I mean, you certainly have the expertise to make those comments and that's why we're here with you, but let me follow up just a minute 'cause I think what you're saying, and I understood your testimony to be that the typical benchmarks that you look at in valuing this type of a property were giving you no reason to believe that the risk that everyone was talking about was actually being affected in the marketplace as of that time. Is that a fair summary of what's you're saying?

"A. Yeah. There was no, there was no evidence of these additional risks showing up in the marketplace for the different aspects that we looked at."

The evidence supports BOTA's determination of ANR's income for the years in question notwithstanding the PVD's use of histor-

ical evidence of ANR's income. The historical evidence provides some evidence regarding future income and together with the PVD's attempts to determine the effect of FERC Order 636 in the marketplace along with other evidence provides substantial competent evidence supporting BOTA's income determinations.

The PVD bolstered its case by showing through ANR's own internal documents that it did not forecast a significant decrease in its income. Other evidence in the form of statements from the President, Chief Executive Officer, and Director of ANR indicates that there were opportunities associated with Order 636 that could lead to increased income.

BOTA considered ANR's income projections but rejected them. John Goodman's appraisals, as well as ANR's other appraiser, used an obsolescence approach which is not one of the generally accepted appraisal procedures provided for in K.S.A. 79-5a04. ANR's use of the income shortfall method does not rely on a comparison to other properties to obtain the rent loss; a discount rate was used rather that a direct capitalization rate; and the method used forces the cost approach to equal the income approach if both approaches are consistently applied. Last, evidence before BOTA indicated that the capitalization rate component of the income approach incorporated any additional risk associated with FERC Order 636.

BOTA was acting within its area of expertise, and its decision to adopt the PVD's income figures for the years in question is entitled to great weight and deference. While the evidence in this case was conflicting, we conclude that BOTA's decision is supported by substantial evidence and is not unreasonable, arbitrary, or capricious.

## BOTA'S EXCLUSION OF ANR'S 1996 INCOME

In its prior decision, BOTA admitted evidence of ANR's postappraisal income based upon this court's decision in *Board of Ness County Comm'rs v. Bankoff Oil Co.*, 265 Kan. 525, 960 P.2d 1279 (1998). However, in this present case, BOTA concluded that it was error to allow the submission of the post-valuation income. BOTA did not discuss *Bankoff* but did conclude that post-valuation data is not typically allowed to determine present value except in cases

where there is no relevant data available on the valuation date and such post-valuation data is in close proximity to the valuation date.

ANR argues that the exclusion is an abuse of discretion and contrary to our decision in *Bankoff*. ANR sought admission of its 1996 income for the purpose of corroborating the income forecasts of its expert appraiser, Goodman.

ANR discusses the generally accepted appraisal standards and procedures in valuing public utility property according to an income approach. Relying on eminent authority in the field of appraisals and case law, ANR states that the authorities establish that it is the anticipated future income projection, not actual future income that is critical in the income approach. "Failure to consider future income would contradict the principle of anticipation, which holds that value is the present worth of future benefits." Appraisal Institute, The Appraisal of Real Estate 471 (11th ed. 1996). We agree that admission of actual income figures for future years beyond the valuation date contradicts the principle of anticipation and undermines and distorts an income approach to value. It is almost universally accepted that actual future income figures are not to be considered when considering future income projections under the income approach to value. "[T]he valuation, although based upon a forecast of earnings, must be found upon what was known and anticipated as of the assessing date, unaided by hindsight." *New Brunswick v. State of N.J. Div. of Tax Appeals*, 39 N.J. 537, 545, 189 A.2d 702 (1963).

*Bankoff* provides little if any support for admission of ANR's 1996 income. While *Bankoff* held that post-valuation income was admissible for purposes of determining the taxable value of an oil and gas lease, the similarities between *Bankoff* and this case stop there. See 265 Kan. at 544. *Bankoff* involved the 1993 taxes on an oil and gas lease in Ness County. Bankoff operated two wells on the Linden oil and gas lease in the Brownell field producing oil from the Cherokee sand formation in Ness County.

The Linden lease had shown no decline characteristics for the years 1989, 1990, and 1991, primarily due to restrictions of the production equipment. However, the lease commenced a characteristic decline in late 1992, and Bankoff sought admission of data

from the first quarter of 1993 so that the last quarter of 1992 could be compared with the first quarter of 1993 to establish a 50% decline in value. Absent such evidence, comparing the Linden lease's production in 1991 to that in 1993 demonstrated a decline rate of only 2%. BOTA initially refused to allow the 1993 income figure but upon reconsideration admitted the 1993 figures resulting in a tax refund of approximately $83,000.

The Kansas Court of Appeals reversed BOTA, holding that K.S.A. 79-301 called for personal property subject to taxation be assessed as of January 1 of each year. *Board of Ness County Comm'rs v. Bankoff Oil Co.*, 24 Kan. App. 2d 532, 949 P.2d 628 (1997). The guide developed by the PVD and relied upon by BOTA was in conflict with such statutes and therefore was invalid. Thus, the practice of using data beyond the January 1 assessment date was thereby prohibited. 24 Kan. App. 2d at 539-40. We granted Bankoff's petition for review.

After an analysis of the taxing statutes involved and the guide developed by the PVD, we reversed the Court of Appeals, noting:

"The appraisal difficulties created by the flush production of a new lease are similar to the difficulties encountered when a lease begins a production decline late in the year preceding appraisal. The Guide developed by the Division of Property Valuation treats both incidents similarly, as the failure to properly calculate and confirm the decline rate of a lease would inaccurately reflect its future production and result in an inaccurate valuation and assessment, just as the failure to account for flush production in a new well would." 264 Kan. at 541-42.

"In addition, in K.S.A. 79-506, the legislature specifically adopted the Uniform Standards of Professional Appraisal Practice issued by the Appraisal Standards Board in effect on March 1, 1992. The *amicus curiae* points out that Appraisal Standard No. 3, adopted by the legislature, acknowledges that retrospective appraisals may be appropriate for property tax matters and permits appraisers to consider data subsequent to the effective date of appraisal to confirm trends which would have been considered by a buyer or seller as of the effective date in arriving at a retrospective value.

. . . .

"Refusing to allow consideration of post-January 1 production data when assessing an oil or gas lease that has suffered a decline in production would be to ignore relevant and available factual information pertaining to the lease's future productivity and income. This result is not required by K.S.A. 79-503a, is contrary to assessment principles embodied in the statutory scheme, and denies the ex-

pertise wielded by the Director of Property Valuation in adopting the Guide." 265 Kan. at 542-44.

*Bankoff* cited Appraisal Standard No. 3 of the Uniform Standards of Professional Appraisal Practice issued by the Appraisal Standards Board. 265 Kan. at 542. That standard permits the use of data subsequent to the valuation date, but cautions that a logical cut-off must be determined because at some point the later data does not reflect the relevant market on the date of valuation. Further, the standard cautions that "[*i*]*n the absence of evidence in the market that data subsequent to the effective date was consistent with and confirmed market expectations as of the effective date, the effective date should be used as the cut-off date for data considered by the appraiser.*" (Emphasis added.) Appraisal Standards Board, Uniform Standards of Professional Appraisal Practice 71 (1998).

A correct reading of *Bankoff* demonstrates that consideration of post-valuation data becomes admissible when no data is available and the time lapse is within close proximity to the evaluation date. Here, ANR seeks to enter its 1996 income data some 28 and 40 months after the close of the valuation date in a situation where evidence exists to make the necessary projections from the valuation date without the aid of actual post-valuation data. Allowance of such evidence undermines the appraisal process and is contrary to the principles involved in the income approach to value.

Unlike *Bankoff*, this case does not involve a change just prior to the date of valuation. The issue in this case is the effects of Order 636, which were debated significantly in years prior to the valuation dates of January 1, 1994, and January 1, 1995, at issue in this case. ANR was given the opportunity in this case to present testimony that its income was going to decline. This it did.

Appraisal Standard No. 3 of the Uniform Standards of Professional Appraisal Practice expressly provides that the cut-off date in a case of this nature should be the valuation date. *Bankoff* fails under the facts of this case to provide authority for admission of the 1996 income. To say that the 1996 income of ANR was to be limited as corroborating evidence of its expert Goodman's projection does not change our conclusion when most of the experts

testifying in this case agree that such evidence should not be considered in the income approach to value.

## CAPITALIZATION RATES

ANR argues BOTA erred by accepting the PVD's capitalization rate. The PVD argues that the capitalization rate adopted by BOTA was based upon substantial evidence. Further, the PVD criticizes the alternative capitalization rates proposed by ANR based upon their excessive reliance upon the equity component of the equation at the expense of ignoring the debt component of the overall capitalization rate.

Our standard of review is whether BOTA's capitalization rates are supported by substantial competent evidence. In this regard, as noted in the discussion of BOTA's determination of ANR's income for the years in question, appellate courts do not reweigh the evidence or pass on the credibility of the witnesses. If the evidence considered in the light most favorable to BOTA supports BOTA's decision it will not be disturbed on appeal.

BOTA had determined in its decision prior to remand that an overall capitalization rate of 12% for 1994 and an overall capitalization rate of 12.7% for 1995 was appropriate. On remand, BOTA reversed itself stating:

"The Board concludes that it was error for the Board to increase the equity rate in the prior decision. The Board concludes that the 11% capitalization rate for 1994 and 11.5% for 1995 are appropriate in that they appear to account for all risk attributable to FERC 636 and are in line with industry derived rates."

BOTA's decision with respect to the capitalization rates are in line with the interstate natural gas pipeline industry. A 1994 capitalization rate study prepared by a subcommittee of the Property Tax Forum was introduced into evidence. This forum is an organization of tax representatives from a majority of the natural gas pipeline companies in the United States with some representation in Canada. ANR is a member company of the Property Tax Forum and was also a member of the Capitalization Rate Subcommittee in 1994. The report indicates that member companies support the formulas and the information as stated in the capitalization study. For the year 1994, the report recommends that an overall capital-

ization rate of 11.30% is the proper average yield capitalization rate when capitalizing the net operating income of interstate natural gas transmission pipeline companies. BOTA adopted an overall capitalization rate of 11%. ANR proposed an overall capitalization rate of 12% for the year 1994.

A 1995 capitalization rate study prepared by a subcommittee of the Property Tax Forum was also introduced into evidence. ANR was also a member company of the Property Tax Forum and was a member of the Capitalization Rate Subcommittee in 1995. The report indicates that these companies support the formulas and the information as stated in this study. For the year 1995, the report recommends that an overall capitalization rate of 12% is the proper average yield capitalization rate when capitalizing the net operating income of interstate natural gas transmission pipeline companies. BOTA adopted an overall capitalization rate of 11.5%. ANR proposed an overall capitalization rate of 12.7% for the year 1995.

Goodwin and Ifflander, both expert appraisers for PVD, provided supporting evidence for BOTA's 1994 and 1995 capitalization rates. The capitalization rate is composed of both debt and equity. Goodwin's testimony was critical of the rates used by ANR appraisers Goodman and Davis. According to Goodwin, the capital structure used in the ANR appraisals were based on the actual capital structure of ANR instead of based on optimal or an average capital structure as indicated by comparable companies. The industry average capital structure percentages is closer to 50% debt and 50% equity, which is clearly different from the weighted average based upon the 40% debt and 60% equity structure used by Goodman. The net effect of relying on a skewed capital structure is to bias the weighted average cost of capital upward, resulting in a lower unit value.

While ANR presented expert testimony critical of the analysis used by Goodwin and Ifflander, we do not reweigh the evidence. In balance, the rates used by BOTA in its determination of the unit value of ANR's property for 1994 and 1995, based upon the record before us, are supported by substantial competent evidence.

### INTANGIBLE PROPERTY

ANR argues BOTA failed to exclude intangible property in the

form of installation expenses and overhead. This contention is based upon the Kansas Constitution. The PVD argues that if such intangible personal property enhances the value of tangible property, it is subject to taxation in Kansas.

The Kansas Constitution provides that property is divided into two classes for taxation purposes: Class 1 consists of real property, and Class 2 consists of tangible personal property. Kan. Const. art. 11, § 1. Class 2 is further divided into six subsections. The third subsection which applies in this case includes "[p]ublic utility tangible personal property." Kan. Const. art. 11, § 1.

It is fundamental that the Kansas Constitution limits rather than confers powers. Where the constitutionality of a statute is involved, the question presented is not whether the act is authorized by the constitution, but whether it is prohibited thereby. See *State ex. rel. Schneider v. Kennedy*, 225 Kan. 13, 20, 587 P.2d 844 (1978), and cases collected therein. Nothing in the Kansas Constitution prohibits the taxation of public utility intangibles. We are required to presume that K.S.A. 79-5a04 is constitutional. Thus, if there is a reasonable way a statute may be construed to be constitutionally permissible, that should be done. *State ex. rel. Stephan v. Martin*, 230 Kan. 747, ¶ 2, 641 P.2d 1011 (1982).

The Kansas Constitution does not mention intangibles. See *In re Tax Appeal of Western Resources, Inc.*, 22 Kan. App. 2d 593, 598-99, 919 P.2d 1048 (1996). However, this court in *In re Tax Protest of Strayer*, 239 Kan. 136, 143, 716 P.2d 588 (1986), held that an intangible which constitutes an essential portion of a tangible asset, without which the tangible asset could not function, is taxable as tangible property. The Court of Appeals in *Western Resources* held that intangible property "may be used to the extent that it creates an 'enhanced' value of tangible property." 22 Kan. App. 2d at 602.

BOTA also determined that:

"The burden of proof is on the Taxpayer to identify any non-taxable intangibles in the Taxpayer's unit value allocated to Kansas. Once specific intangibles have been identified, the Director [PVD] is required to show that the intangibles merely enhance the value of tangible property. If the Director cannot meet this burden, then the value of the intangible must be removed from the unit valuation.

Id. at 603-604. The Board [BOTA] finds that the Taxpayer has not met its burden of identifying intangible assets that have been included in the unit value. Even if it had, the Board is convinced that the methodology used by the Director to determine the unit value did not attribute any additive value to intangible assets, but simply would have accounted for any enhancement value to the unit as a whole."

ANR advances two arguments. First and most importantly, ANR argues that BOTA failed in its task of removing installation expenses in its determination of the unit value of ANR. ANR argues that such expenses are intangible property not subject to taxation in Kansas and that such intangibles do not meet the test for inclusion in the unit value set forth in *Western Resources*, 22 Kan. App. 2d at 598-99. For its second argument, ANR, relying on *Western Resources*, contends that BOTA erred in its conclusion that ANR did not identify intangibles that were included in its unit value. According to ANR, once specific intangibles have been identified, the PVD is required to explain to what extent the taxpayer's taxes are based on the value of the intangibles in question. See *Western Resources*, 22 Kan. App. 2d at 604.

ANR also contends that BOTA misapplied *Board of Leavenworth County Comm'rs v. McGraw Fertilizer Serv., Inc.*, 261 Kan. 901, 933 P.2d 698 (1997), and that *McGraw* supports its claim that installation costs are intangibles and should not be subjected to ad valorem taxation. Because there is no evidence in the record that the identified intangibles merely enhanced the value of specific tangible personal property within the unit application, ANR argues that *Western Resources* requires that the intangibles be removed. Finally, ANR argues that if the identified intangibles are not removed this court must face the constitutional issue left undecided in *Western Resources*: Can taxation of intangibles be reconciled with art. 11, § 1 of the Kansas Constitution? If inclusion is authorized by statute, ANR contends K.S.A. 79-5a04 is unconstitutional.

The intricate and persuasive argument advanced by ANR is dependent upon the Kansas Constitution, Kansas statutory law, and Kansan case law interpreting both the constitution and statutes governing the taxation of public utilities in this state. However, it is important to note that the issue before BOTA, and now before

this court, is the unit value of ANR. ANR was valued using the unit method, which is authorized and preferred in K.S.A. 79-5a04. We described the process above, but we think Professor James C. Bonbright's description is worth repeating here:

"Under this rule, in its more thoroughgoing form, the entire enterprise is first valued as a unit, some 'fair share' of this value (perhaps after the deduction of certain asset values deemed inappropriate for allocation) being attributed to the particular state or district that is imposing the tax. The resulting figure is presumed to measure the 'true value' of that portion of the corporate property which comes under the assessor's taxing power." Bonbright, The Valuation of Property 633-34 (1937).

K.S.A. 79-5a04 requires the PVD to determine the fair market value of public utility property annually, both real and personal, *tangible* and intangible. The only intangibles expressly exempt from taxation are notes and other evidence of debt. See K.S.A. 79-3109c. ANR claimed that only the money and cost of materials should be included and taxed. ANR argued before BOTA and now before this court that the cost of installing those materials, overhead, and other related expenses are intangibles and not subject to taxation in Kansas.

ANR's argument is not supported in the record. The cost of installation, overhead, and other related expenses are an integral part of the whole. Failure to include such costs would frustrate any attempt to determine the fair market value of ANR's property under the unit approach. See K.S.A. 79-5a04. Neither the cases relied on by ANR, nor evidence in the record, support the exclusion of the cost of installation, overhead, and other related expenses in determining the unit value of ANR's property.

BOTA concluded that installation costs and overhead enhanced the value of tangible personal property and was, therefore, subject to taxation. Ifflander testified that installation costs should be included in the value of tangible assets because they are necessary to put assets into place and to make them fully functional.

ANR contends that BOTA misapplied *McGraw*, 261 Kan. 901, and that this case establishes that installation expenses are intangibles not subject to taxation. The taxpayer in *McGraw* acknowledged that ad valorem tax was due on its commercial and industrial

machinery and equipment but claimed that the charges for installation, freight, and sales tax on that same machinery and equipment should not be taxed. The issue raised in the district court involved the interpretation of the definition of "retail cost when new" found in Kan. Const. art. 11, § 1(b), Class 2(5). 261 Kan. at 902. The district court excluded charges for installation, freight, and sales tax, and the case was appealed to this court.

While this court in *McGraw* concluded that installation expenses, under the *Strayer* analysis, are more similar to intangible than tangible property, 261 Kan. at 921-22, resolution of the issue depended upon an interpretation of the language in our constitution, "retail cost when new." Thus, our decision in *McGraw* did not depend upon whether the property in question was tangible or intangible property but rather on the meaning of the phrase "retail cost when new." *McGraw* notes that in Kansas "retail cost when new" has replaced "fair market value." 261 Kan. at 906. However, in this case fair market value remains the central issue. *McGraw* further notes:

"No other taxing jurisdiction in the United States, including the I.R.S., uses the terminology 'retail cost when new.' This term is unique to the State of Kansas. It is not the equivalent of 'fair market value,' 'cost basis for federal income tax purposes,' 'cost basis for accounting purposes,' or 'cost approach to fair market value.'" 261 Kan. at 914-15.

*McGraw* struggled with the meaning of the phrase of "retail cost when new" and the question of whether the phrase included or excluded freight and installation costs for ad valorem tax purposes. Again, *McGraw* provides little if any support for ANR's contention that installation costs and overhead are properly excluded from ad valorem tax in Kansas.

*McGraw* concludes with this holding:

"Article 11, § 1(b)(1) of the Kansas Constitution and K.S.A. 1996 Supp. 79-1439 both state that commercial equipment shall be *valued* at its 'retail cost when new.' If the legislature had intended the phrase to always include freight and installation in the value of the item sold for ad valorem property taxes, it could have so specified when adopting House Concurrent Resolution 5018 for submission to the voters." 261 Kan. at 920.

Other than the phrase in *McGraw* that "freight and installation costs are more similar to intangible than tangible property," the case provides little support to ANR and is not helpful to this court in resolving the issue we now consider. See 261 Kan. at 921.

ANR questions the application of *Western Resources*, 22 Kan. App. 2d 593, and its holding that intangible property even though nontaxable may be included in valuing the business of a public utility to the extent it is used to enhance the value of tangible personal property. ANR argues that the PVD did not meet its burden of establishing "enhancement" once the intangibles were identified by ANR. In *Western Resources,* there was a real question as to whether the software program being taxed enhanced the tangible personal property. BOTA was reversed, and the case was remanded for determination of this question. ANR is not in a similar situation. The installation and overhead expenses in this case are known, and the argument that such expenses do not enhance the value of tangible personal property of ANR is without merit.

The expenses included are an integral part of the value of the whole unit. We must consider the nature of the unit method used in this case. As noted in *Western Resources*, the "unit system taxes only the total value of a business as a going concern. It does not tax, nor does it necessarily include, the fair market value of all of the component parts. [Citations omitted.]" 22 Kan. App. 2d at 509. Thus, the unit value may include the fair market value of the tangible, real, and intangible property which makes up the assets of the business. Unlike *Western Resources* where there was a genuine question as to whether the software was an essential, integral part of the going concern, ANR's intangible costs and expenses are known to be an essential and integral part of ANR's going concern or business. If such expenses were to be excluded, it would not be possible to determine the fair market value of ANR's property in Kansas under the unit method. Valuing such expenses is consistent with the Kansas Constitution, art. 11, § 1, Class 2, Subclass 3 and those statutes governing taxation of public utilities in Kansas.

The record supports a conclusion that installation and overhead expenses are essential and integral parts of the unit value. Michael Goodwin, the PVD's review appraiser, explained:

"Q. (By Mr. Daw) Mr. Goodwin, what is your opinion regarding the inclusion or exclusion of soft costs from tangible asset values?

"A. [By Mr. Goodwin] When you appraise tangible assets you clearly, according to every textbook, must include all of the costs of assembling those assets or those properties into a functioning unit and among the things, among the elements of those costs which you need to reflect in a cost approach would be a category we call soft or indirect costs, things like accounting fees, engineering studies, surveys, permits, things of that variety.

"Q. Would that include installation?

"A. It necessarily includes installation, yes.

"Q. Overheads from installers, overheads from the company that installed things?

"A. Company or contractor overheads, any of those again soft costs which are necessary to put the asset in place and to have it fully installed and fully functional."

ANR appraiser John C. Goodman, testifying on the authoritative text of The Appraisal of Real Estate agreed that soft costs such as contractors and overhead and installation costs are included in tangible property and all such intangibles were included in his appraisal of ANR property. See Appraisal Institute, The Appraisal of Real Estate (11th ed. 1996). Dr. John H. Davis III, ANR's other appraiser, also included intangibles in his appraisal.

Thus, the evidence does not support ANR's position. It is apparent that by their very nature such expenses are so integral to a determination of the fair market value of the unit that exclusion of such would distort and frustrate the goal of determining the fair market value of ANR's properties in Kansas.

While this issue is resolved based upon the Kansas Constitution and Kansas case and statutory law, we note that the position we adopt herein is supported by the overwhelming weight of authority regarding the inclusion of such intangibles in valuing ANR's unit value. See *Pullman Co. v. Richardson*, 261 U.S. 330, 67 L. Ed. 652, 43 S. Ct. 366 (1923); *ITT World Communication, Inc., v. San Francisco*, 37 Cal. 3d 859, 210 Cal Rptr. 226, 639 P.2d 811 (1985); *Mich. Wis. Pipe Line v. Iowa State Bd. of Rev.*, 368 N.W.2d 187 (Iowa. 1985); *Detroit Citizen's St. R. v. Common Council*, 125 Mich. 673, 85 N.W. 96 (1901); Lambert, *Cellular Telephone Companies; Property Tax Litigation in California*, J. Prop. Tax Mgmt. 15, 16 (Spring 1991); Green & Benshoof, *Exclusion of Intangibles*

*From the Unit Value*, 1 St. Tax Notes 547, 548-49 (1991); Amdur, *Property Taxation of Regulated Industries*, 40 Tax Law. 339, 347 (1987).

*ITT World Communications, Inc. v. San Francisco*, expresses the rationale for allowing taxation of the enhanced value imparted by intangible property to ensure that the entire real value of a company's property is considered:

"One of the primary objectives to the system of unit taxation of public utility property is to ascertain and reach with the taxing power the entire real value of such property. . . . It has long been recognized that 'public utility property cannot be regarded as merely land, buildings, and other assets. Rather, its value depends on the interrelation and operation of the entire utility as a unit. Many of the separate assets would be practically valueless without the rest of the system. Ten miles of telephone wire or one specially designed turbin would have a questionable value, other than as scrap, without the benefit of the rest of the system as a whole.' (Bertane, [The Assessment of Public Utility Property in California (1973) 20 UCLA L. Rev. 419] 433.) Unit taxation prevents real but intangible value from escaping assessment and taxation by treating public utility property as a whole, undifferentiated into separate assets (land, buildings, vehicles, etc.) or even separate kinds of assets (realty or personalty)." 37 Cal. 3d at 863.

BOTA's inclusion of intangibles in its valuation does not raise a Kansas constitutional issue, and BOTA's decision to include such intangibles is factually and legally supported in the record.

Affirmed.

ABBOTT, J., not participating.

BRAZIL, S.J., assigned