No. 92,655

In the Matter of the Appeals of CIG FIELD SERVICES COMPANY from Orders of the Director of Property Valuation of the State of Kansas

112 P.3d 138

Opinion filed June 3, 2005.

*Laurence E. Garrett*, of the El Paso Corporation, of Colorado Springs, Colorado, argued the cause, and *Michael Lennen*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, and was with him on the briefs for appellant.

*William E. Waters,* of Division of Property Valuation, Kansas Department of Revenue, argued the cause and was on brief for appellee.

The opinion of the court was delivered by

BEIER, J.: CIG Field Services Company (CIG) appeals from a decision by the Board of Tax Appeals (BOTA), which upheld the Department of Revenue's valuations and assessments for tax years 1997 to 2003. CIG contends that Kansas' statutory differentiation between the tax treatment for interstate and intercounty gas gathering systems on the one hand and intracounty gas gathering systems on the other violates the federal Commerce Clause and the federal and state Equal Protection Clauses.

During the tax years in question, appellant CIG owned and operated certain natural gas gathering systems in Kansas. Those systems crossed the state line into Oklahoma and Colorado. The Property Valuation Division of the Kansas Department of Revenue (PVD) therefore valued and assessed CIG's property as public utility property at 33 percent of its fair market value, pursuant to K.S.A. 79-5a01 and K.S.A. 79-1439(b)(2)(C). Intercounty gas gathering systems also meet the statutory definition of "public utility" under K.S.A. 79-5a01 and are valued in the same manner and assessed by the PVD at the same tax rate as interstate gas gathering systems.

In contrast, intracounty gathering systems do not meet the definition of "public utility" under K.S.A. 79-5a01. Their property is classified instead as "commercial and industrial" property. Such property is depreciated on a 7-year, straight-line basis to a floor of 20 percent of its original cost and assessed by the county appraiser at 25 percent of its calculated depreciated value, pursuant to K.S.A. 79-1439(b)(2)(E).

None of the above facts has been in dispute. The parties also stipulated before BOTA that Kansas Corporation Commission licensing and regulation of gas gatherers is the same regardless of tax classification.

Other evidence before BOTA was conflicting, including the expert testimony on whether interstate and intercounty gas gath-

ering systems were competitive with or otherwise similarly situated to intrastate gas gathering systems.

Richard Heltzel, ad valorem tax manager, indicated that, hypothetically, if the Kansas property taxes on CIG's property are higher than the taxes on comparable property owned by a similarly situated intracounty facility, "[t]he end result would be increase in costs of doing business and probably put the locally assessed gatherer at a competitive advantage I would think."

Dr. David Dismukes, CIG's consulting economist, examined the nature of natural gas gathering in Kansas to determine the competitive structure of the industry. He concluded that, although there is some moderate concentration of ownership in the market, Kansas is "well within a competitive market structure for gathering services" whether the companies involved are intercounty, intracounty, or interstate. In addition, Dismukes agreed there was "heads-up" competition between intracounty gathering systems and CIG and opined they were similarly situated. He observed, for example, that in Haskell County, Kansas, there are some intracounty transmission pipelines in "very close proximity if not laying right on top of" CIG's line. Dismukes said these lines could either be connecting or close enough in proximity to pull "leases or wells or other volumes" from those areas.

Dismukes gave no specific examples to support the theory that the intracounty systems gained a competitive edge through differential valuation and assessment. In addition, Dismukes conceded that a low-volume producer might not have the same economic opportunities as a large-volume producer.

Glenn Smith, a private consultant retained by the Department of Revenue and a former Chief of Pipeline Safety for the Kansas Corporation Commission, testified that intracounty gas gathering systems generally gather gas from marginal wells. Further, both Smith and Robert Badenoch, Bureau Chief for State Appraised Properties, indicated that intracounty systems generally are not directly connected to a transmission pipeline because intracounty systems do not have the necessary pressure. According to Smith, intracounty systems are "short segments of pipe which interconnect with other gathering systems through which the gas is moved."

Generally intracounty gas gathering systems are connected to intercounty systems.

Smith disagreed with Dismukes' conclusions that interstate and intercounty systems are competitive with and similarly situated to intracounty systems. He concluded that intracounty systems are customers, not competitors, of intercounty systems, because most natural gas transported by intracounty systems also is transported by interstate or intercounty systems for a fee.

### The BOTA Decision

The BOTA majority ultimately found that the cumulative appraised value for CIG property for 1997 to 2003 was approximately $11 million higher than it would have been if CIG were an intracounty gas gathering system and its property classified as commercial or industrial rather than public utility. The corresponding higher tax impact was approximately $900,000.

The BOTA majority stated the following among its paragraphs of "ANALYSIS AND FACTUAL CONCLUSIONS":

"[18] . . . .

. . . .

(b) The Taxpayer introduced evidence demonstrating that as an interstate gas gathering company, [it is] adversely affected by the different tax treatment accorded intra-county gas gathering companies under K.S.A. 79-5a01. . . . Taxpayer has made a showing that it was unfavorably affected vis-a-vis a higher tax impact.

(c) In many significant respects, the Taxpayer is similarly situated with intra-county gas gathering companies.

    (i) According to a witness for the Department, because most intra-county gas gathering systems interconnect with an inter-county/interstate gas gathering system, 'virtually all' of the natural gas produced in Kansas is transported by inter-county/interstate gas gathering systems . . . . This would tend to acknowledge that most gas gathering systems in Kansas are similarly situated.

    (ii) [N]atural gas gathering systems are not regulated differently by the KCC based on mileage of pipe; volumes of throughput; the number of wells connected to particular systems; or their geographic location . . . . There are no functional differences between a natural gas gathering system located and operating in a single county and one that crosses state lines . . . . Furthermore, natural gas systems are not required to seek KCC approval to serve particular wells or geographic areas . . . .

(iii) As acknowledged by . . . a witness for the Department, whether gathering systems cross either county or state lines is more a product of where producing wells may be located (*i.e.*, a matter of 'happenstance') than a matter of design . . . . As further embellished by a witness for the Taxpayer, all such systems — whether single county, multi-county or interstate — consist of pipes collecting natural gas and moving it from the wellhead to more centralized locations such as processing plants or pipelines. . . .

(iv) With regard to the degree of competition within the natural gas gathering business in Kansas, according to a witness for the Department, there is virtually no competition within the natural gas gathering business in Kansas because: (i) gas gathering services are existent to handle all producing wells; (ii) the construction of new facilities when existing gas gathering contracts expire is expensive and not cost effective . . . ; and (iii) there is little evidence of gas gatherers losing customers to other gas gatherers . . . . However, according to a witness for the Taxpayer, although small gas gathering companies have some barriers to entry into the Kansas gas gathering market, which include capital requirements and management . . . , there are a number of alternatives available to the purchasers of natural gas gathering services (*i.e.*, producers) in the Kansas natural gas gathering market. These alternatives include: (1) purchasing gathering services from an inter-county-interstate provider; (2) purchasing gathering services from an intercounty/intrastate provider; (3) purchasing gathering services from an intra-county provider; or (4) self providing those gathering services.

The Department's claim that intra-county systems are customers and not competitors with interstate systems fails to recognize one of the most basic, and fundamental conditions of competition in all infrastructure industries (pipelines, power transmission, telecommunications) over the past 20 years: open access and interconnectivity into physical infrastructure systems. In the case of natural gas gathering and transmission systems, the open season/open access requirement of [Federal Energy Regulatory Commission] Order 636 [requiring interstate pipelines to "unbundle" transportation and sales and provide transportation to buyers from other sources] is a key component of pipeline transmission competition . . . .

There are various degrees of market competitiveness depending upon whether the market structure is monopoly, oligopoly, monopolistic competition, or pure competition . . . . Of these four broad market structure classifications, only one form of market structure entirely precludes all competition — a monopoly market structure. In a monopoly, there is only one firm and the firm is the market. However, the other three market structures represent, to varying degrees, some form of competi-

tion.

In response to questioning from the Department's counsel regarding competitive factors affecting natural gas gatherers, . . . a witness for the Taxpayer . . . testified that he was aware of several instances where producers had changed natural gas gatherers and that contracts between producers and gatherers are generally short term, with some contracts having a duration of five years or less . . . .

In 1997, the four largest gas-gathering companies in Kansas . . . accounted for 72% of all pipeline connections in Kansas . . . . By the end of calendar year 2002, the four largest gas-gathering companies in Kansas . . . accounted for 67% of the well connections in Kansas. . . . This apparent loss by the four largest gas-gathering companies in Kansas of approximately 7% of the Kansas well/pipeline connections to smaller gas gatherers would tend to indicate increasing competition and declining concentration for such connections among Kansas gas gatherers from 1997 through 2002.

[I]ntra-county systems account for 12% of the total natural gas volume in Kansas, while the inter-county systems account for 88% to 89% of the volume . . . . [A]t the end of calendar year 2002, the four largest gas gathering companies in Kansas . . . accounted for 67.5% of the total gathering volume in 2002 . . . . Therefore, the other 32 inter-county systems accounted for only 21% of the total volume in the state, an average of less than 2/3 of 1% of the total volume per system. Consequently, the vast majority (nearly 90%) of the inter—county operators are responsible for relatively small volumes of natural gas, much like the intra-county operators. Thus, the inter-county systems are generally similarly situated to the intra-county systems.

. . . .

(d) . . . .

    (i) [T]he method of valuing and assessing single county natural gas gathering systems is not contingent upon and does not differ as a result of: the geographic location of such systems; the rural or urban character of the counties where such natural gas gathering systems are located; the economic characteristics of such counties; the throughput volumes of such gathering systems; the length of such systems; the number of wells connected to such systems; the financial size or strength of such system owners; or, the number of employees utilized in operating such systems. [Citations omitted.]"

Based on all of its findings and conclusions, the BOTA majority decided interstate and intercounty gas gathering systems were competitive with intracounty systems:

"In sum, the record establishes that natural gas gathering systems in Kansas, whether single-county, multi-county or interstate, operate in a relatively competitive market environment and may compete with one another. As an interstate natural gas gatherer, the Taxpayer frequently competes in the same market with some multi-county and single-county natural gas gathering systems."

The majority also characterized the Kansas statutory scheme as "discriminatory" and unsupported by any rational basis, but it recognized that it was not free to find K.S.A. 79-5a01 unconstitutional.

"[I]n order for this Board to make any determination regarding whether such discriminatory taxation contravenes the Commerce Clause of the United States Constitution and/or the Equal Protection Clauses of the United States and Kansas Constitutions, the Board would be required to opine about the constitutionality of K.S.A. 79-5a01. As noted herein, it is not within the purview of the Board's authority to render such conclusions. Accordingly, the Board must conclude that the Department's valuation and assessment of the Taxpayer's property in Kansas should be sustained in its entirety for all the years at issue herein."

In a concurring and dissenting opinion, BOTA Chair David L. Patton disagreed with the majority's finding that CIG and other interstate and intercounty gas gathering systems were competitive with or similarly situated to intracounty systems.

Patton focused on testimony distinguishing the types of wells served by the various gas gathering systems and detailing the economic disincentives for interstate and intercounty systems to build lines to marginal wells. He also emphasized CIG's greater access to investment, distant markets, capital markets, and "economics of scale," when compared with intracounty gatherers; and he read Smith's testimony to say that there was "virtually no competition within the gas gathering business in Kansas." In particular, he stressed that there was "no evidence . . . that the Taxpayer has ever lost a contract to an intra-county gas gathering company" and "no evidence . . . that the Taxpayer has ever lost revenue or business opportunities because of any tax differences between inter-county/interstate gas gathering systems and intra-county gas gathering systems."

Patton also perceived several possible state interests that could qualify as rational bases for the differential tax treatment at issue: an interest in assuring gas gathering services for marginal wells, an

interest in retaining small businesses within individual counties, an interest in protecting the tax bases of individual counties, and an interest in fostering the creation of jobs in nonmetropolitan areas. He finally concluded that the differential tax treatment was not "part of a legislative scheme designed to discriminate against inter-county/interstate gas gathering systems in favor of intra-county gas gathering systems" and that it did not result in "intentional systematic unequal treatment."

### *The Governing Statutes*

K.S.A. 79-5a01 provides:

"(a) As used in this act, the terms 'public utility' or 'public utilities' shall mean every individual, company, corporation, association of persons, lessees or receivers that now or hereafter are in control, manage or operate a business of:

. . . .

(4) transporting or distributing to, from, through or in this state natural gas, oil or other commodities in pipes or pipelines, or engaging primarily in the business of storing natural gas in an underground formation;

. . . .

"(b) The terms 'public utility' or 'public utilities' shall not include:

. . . .

(2) any individual, company, corporation, association of persons, lessee or receiver owning or operating an oil or natural gas production gathering line which is situated within one county in this state and does not cross any state boundary line." (Emphasis added.)

K.S.A. 79-1439 assigns assessment rates according to a property's classification. It provides in pertinent part:

"(a) All real and tangible personal property which is subject to general ad valorem taxation shall be appraised uniformly and equally as to class and, unless otherwise specified herein, shall be appraised at its fair market value . . . .

"(b) Property shall be classified into the following classes and assessed at the percentage of value prescribed therefor:

. . . .

(2) Personal property shall be classified into the following classes assessed at the percentage of value prescribed therefor:

. . . .

(C) public utility tangible personal property including inventories thereof . . . at 33%. As used in this paragraph, 'public utility' shall have the meaning ascribed thereto by K.S.A. 79-5a01, and amendments thereto;

. . . .

(E) commercial and industrial machinery and equipment . . . , which, if its economic life is seven years or more, shall be valued at its retail cost when new less seven-year straight-line depreciation, or which, if its economic life is less than seven years, shall be valued at its retail cost when new less straight-line depreciation over its economic life, except that, the value so obtained for such property as long as it is being used shall not be less than 20% of the retail cost when new of such property at 25% . . . ."

## Standards of Review

BOTA orders are subject to review under the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.* K.S.A. 77-621 sets out the scope and standard of review. The provisions potentially relevant to this case allow us to grant relief where:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied; (2) the agency has acted beyond the jurisdiction conferred by any provision of law; . . . (4) the agency has erroneously interpreted or applied the law; . . . [or] (7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole . . . ." K.S.A. 77-621(c).

In other words, our review of BOTA's findings of fact is restricted to determining whether the findings are supported by substantial competent evidence. If so, the findings cannot be disregarded or contradicted on appeal. See *In re Tax Appeal of ANR Pipeline Co.,* 276 Kan. 702, 716, 79 P.3d 751 (2003).

Our review of BOTA's conclusions of law is not so restricted, although we have recently reemphasized that "BOTA is a specialized agency and is considered to be the paramount taxing authority in this state. [Citation omitted.] BOTA is a specialized agency that exists to decide taxation issues. [Citation omitted.] Its decisions are given great weight and deference when it is acting in its area of expertise. [Citation omitted.]" *In re Tax Appeal of Colorado Interstate Gas Co.,* 276 Kan. 672, 682-83, 79 P.3d 770 (2003). However, BOTA does not have the authority to decide the constitutionality of a statute, *Zarda v. State,* 250 Kan. 364, Syl. ¶ 3, 826 P.2d 1365, *cert. denied* 504 U.S. 973 (1992); and the issue of whether a statute is constitutional is one of law. This court's scope of review on issues

of law is unlimited. *U.S.D. 443 v. Kansas State Bd. of Education,* 266 Kan. 75, 81-82, 966 P.2d 68 (1998).

### The Federal Commerce Clause

CIG argues that K.S.A. 79-5a01 violates the Commerce Clause of the United States Constitution because its inclusion of interstate and intercounty natural gas gathering systems as public utilities results in their taxation at an assessed value and rate higher than those applied to intracounty natural gas gathering systems.

Historically the Commerce Clause has been interpreted

" 'not only as authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation.' [Citation omitted.] This restrictive aspect has been referred to as the 'dormant' Commerce Clause. The dormant Commerce Clause prohibits states, unless authorized by Congress, from 'attempting to advance their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state.' [Citation omitted.]" *Water District No. 1 v. Mission Hills Country Club,* 265 Kan. 355, 365-66, 960 P.2d 239 (1998).

Discrimination under the Commerce Clause presupposes a comparison between similarly situated entities. CIG contends its property should be assessed and taxed at the same rate as intracounty gas gathering system property. Therefore, this court must consider the threshold question of whether the interstate and intercounty systems are similarly situated to intracounty systems.

In *General Motors Corp. v. Tracy,* 519 U.S. 278, 299-300, 136 L. Ed. 2d 761, 117 S. Ct. 811 (1997), the Supreme Court recognized the necessity of such an analysis in the context of allegedly competing entities providing different products. *General Motors Corp.* stated:

"This is so for the simple reason that the difference in products may mean that the *different entities serve different markets,* and would continue to do so even if the supposedly discriminatory burden were removed. If in fact that should be the case, eliminating the tax or other regulatory differential would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors.

. . . .

" . . . Thus, in the absence of *actual or prospective competition between supposedly favored and disfavored entities in a single market there can be no local*

*preference*, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." (Emphasis added.) 519 U.S. at 299-300.

Accordingly, it is essential that interstate and intercounty systems such as CIG serve the same market as intracounty systems or that the statute's discrimination affects the systems' economic choices in competitive markets.

On this point, CIG contends, interstate and intercounty gas gathering systems operate in a competitive market with intracounty systems; and no evidence supports cost advantages for interstate or intercounty systems over intracounty systems. CIG further emphasizes that all of the gas gathering systems perform the same functions, transport natural gas from a lease or wellhead to a point of interconnection with a transmission line or processing facility, and are subject to the same regulation. See K.S.A. 2004 Supp. 55-150(d) (defining KCC-regulated gas gathering systems). It points to studies by the Federal Energy Regulatory Commission and the Federal Trade Commission, which were described by its expert witness, Dismukes, to confirm the existence of actual competition in the market in which it operates.

The PVD disputes CIG's contention that lower taxes give intracounty systems a competitive edge. It asserts Dismukes could not cite a specific example to support CIG's theory, and CIG did not introduce evidence that it had lost revenue because of its tax treatment. The PVD also contends intracounty systems are customers of CIG and other interstate or intercounty systems, not competitors, because intracounty systems generally must connect with intercounty/interstate systems to deliver gas to a transmission pipeline. This symbiotic relationship allows interstate and intercounty systems to avoid the cost of building lines to marginal wells, and each type of system thus "fulfills a niche in the natural gas market."

In *General Motors Corp.*, the plaintiff, a buyer of natural gas from an out-of-state marketer, sought refund of a use tax. General Motors challenged the exemption of local distribution companies from sales and use taxes on sellers of natural gas. The Supreme Court noted that the out-of-state marketers did not serve the local distributors' core market of small, captive users, typified by resi-

dential consumers who wanted or needed to buy natural gas "bundled" with services and protections required by regulatory authorities. The Court further observed that, although the "captive" market was not geographically distinguished from the area served by the out-of-state marketers, it was defined economically by its component customers' needs for bundled benefits. 519 U.S. at 301.

While recognizing a possibility of competition between the local distributors and the out-of-state marketers for the noncaptive market, the Supreme Court concluded: "[T]here is good reason to assume that any pricing changes that could result from eliminating the sales tax differential challenged here would be inadequate to create competition between [the local distributors] and marketers for the business of the utilities' core home market." 519 U.S. at 302. Thus the Supreme Court held the local distributors and the marketers were not similarly situated for purposes of dormant Commerce Clause analysis. 519 U.S. at 310. See also *Alaska v. Arctic Maid*, 366 U.S. 199, 204-05, 6 L. Ed. 2d 227, 81 S. Ct. 929 (1961) (holding lower business license on local fish processors raised no issue of discrimination against freezer ships; ships took catches south for canning, did not "compete with those who freeze fish for the retail market"); but see *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 269, 82 L. Ed. 2d 200, 104 S. Ct. 3049 (1984) (holding Hawaii excise tax from which certain locally produced beverages exempt did not present "competitive threat" to other liquors; yet this fact not dispositive of whether competition existed between locally produced beverages and foreign beverages).

In this case, the BOTA majority resolved the issue of whether CIG and systems like it compete with intracounty systems and thus are similarly situated in CIG's favor. Our review of the record persuades us that this issue of fact was contested through a classic battle of the experts. Because there was substantial competent evidence to support the BOTA majority's finding, we are bound by it. It is not the job of this court to reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *Steele v. Harrison*, 220 Kan. 422, 423, 552 P.2d 957 (1976). The BOTA majority performed those functions. Its finding that CIG and in-

tracounty systems were competitive and thus similarly situated must stand.

We next consider whether K.S.A. 79-5a01's differentiation between interstate and intercounty systems and intracounty systems passes a four-part test adopted by the United States Supreme Court in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (1977). If so, it does not violate the Commerce Clause; if it fails the test, it violates the Commerce Clause and must be struck down.

The *Complete Auto* test applied to state taxes subject to a Commerce Clause challenge requires: (1) "the tax [be] applied to an activity with a substantial nexus with" Kansas; (2) the tax be "fairly apportioned"; (3) the tax "not discriminate against interstate commerce"; and (4) the tax "fairly [relate] to the services provided by" Kansas. 430 U.S. at 279. All four requirements must be met for the statute to pass constitutional muster.

The PVD, of course, argues the Kansas statute meets all four requirements of *Complete Auto*. CIG, in its reply brief, concedes the state tax at issue here meets the first, second, and fourth requirements of the test. Accordingly, the only requirement before this court is the third: whether K.S.A. 79-5a01 discriminates against interstate commerce. Kansas cases have not previously dealt with this third requirement.

The *Complete Auto* test's requirements that a tax be fairly apportioned and not be discriminatory against interstate commerce are, at least in part, concerned with avoiding multiple taxation by more than one state. See *Geja's Cafe v. Metro. Pier & Expo. Auth.*, 153 Ill. 2d 239, 255, 606 N.E.2d 1212 (1992). The PVD cites 1 Hellerstein & Hellerstein, State Taxation, ¶ 4.12(2)(d), p. 4-61 (3d ed. 1998), for the proposition that " '[i]t is only "multiple taxation of interstate operations" that offends the Commerce Clause.' " However, as CIG points out in its reply brief, the PVD took this statement out of context, as the Hellersteins were addressing whether a state may tax the full value of instrumentalities of interstate commerce, such as aircraft, that have not acquired a tax situs in other states. There are no multiple taxation issues in

the present case because all of the taxed property is within Kansas' borders.

In the Commerce Clause context, the term "discrimination" means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 99, 128 L. Ed. 2d 13, 114 S. Ct. 1345 (1994).

In *Amerada Hess Corp. v. N.J. Taxation Div.*, 490 U.S. 66, 75, 104 L. Ed. 2d 58, 109 S. Ct. 1617 (1989), the Supreme Court set forth three factors to be evaluated to determine whether the third "discrimination" requirement of the *Complete Auto* test can be met. A state tax discriminates against interstate commerce if it (1) is facially discriminatory, (2) has a discriminatory intent, or (3) has the effect of unduly burdening interstate commerce. 490 U.S. at 75. If any one of these *Amerada Hess* factors is present, discrimination against interstate commerce is established under the third requirement of *Complete Auto*.

CIG does not contend that the Kansas tax assessment procedure has a discriminatory intent; therefore, there is no need to examine the second *Amerada Hess* factor. As a prelude to consideration of the first and third factors, we first note CIG's citation to Professors Hellerstein for the proposition that "the Court has scrutinized claims that a tax discriminates against interstate commerce with considerable vigilance . . . . [Moreover,] it has invalidated discriminatory levies whether or not the discrimination is intentional." 1 Hellerstein & Hellerstein, State Taxation, ¶ 4.13, p. 4-69.

Regarding the first *Amerada Hess* factor, CIG argues that the statute is facially discriminatory because its "public utility" definition excludes competing intracounty natural gas gathering systems. As a result, the intracounty systems receive significant tax benefits not available to interstate and intercounty systems. CIG cites *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 342, 119 L. Ed. 2d 121, 112 S. Ct. 2009 (1992), in which the Supreme Court concluded a tax law is discriminatory if it taxes a transaction more heavily when it crosses state lines than when it occurs entirely within a state. In addition, the Court in *Oregon Waste Systems*, 511 U.S. at 99, stated that state laws applying discriminatory re-

strictions on interstate commerce are "virtually per se invalid." See also 1 Hellerstein & Hellerstein State Taxation, ¶ 4.13, p. 4-69 ("A tax that by its terms or operation imposes greater burdens on out-of-state goods, activities, or enterprises than on competing in-state goods, activities, or enterprises will be struck down as discriminatory under the Commerce Clause.").

The PVD, for its part, directs our attention to *Nashville, C. & St. L. Ry. v. Browning*, 310 U.S. 362, 84 L. Ed. 1254, 60 S. Ct. 968 (1940), in which the Supreme Court considered the constitutionality of a Tennessee ad valorem tax law. The law provided that the property of railroad and other public utility corporations was to be assessed for tax purposes at full cash value, while all other kinds of property were to be assessed at less than cash value. In addition, property of public service corporations was to be assessed by the Railroad and the Public Utilities Commission, while all other property was to be assessed by local officials. For more than 40 years, local officials had valued property at far less than its true worth, while the Commission had assessed property at full value. The Supreme Court found no constitutional violation. The *Nashville* Court emphasized that states may "classify property for taxation; may set up different modes of assessment, valuation and collection; may tax some kinds of property at higher rates than others; and . . . may treat . . . utilities with that separateness which their distinctive characteristics and functions in society make appropriate." 310 U.S. at 368.

PVD's reliance on this language is unpersuasive. It comes from the Supreme Court's Equal Protection rather than Commerce Clause analysis.

The PVD also cites *In re Tax Appeal of ANR Pipeline Co.*, 254 Kan. 534, 546-48, 866 P.2d 1060, *cert. denied* 513 U.S. 917 (1994), *abrogation recognized by Colorado Interstate Gas Co. v. Beshears*, 271 Kan. 596, 24 P.3d 113 (2001). In *ANR Pipeline*, BOTA refused to grant the Pipeline's request to have its property assessed on the same basis as railroad property. The federal Railroad Revitalization & Regulatory Reform Act of 1976 placed limitations on state taxation of railroad property. This court held that taxing railroads and pipelines differently did not violate the Commerce Clause or the

Equal Protection Clause. 254 Kan. at 544-48. This Court noted that Kansas treated railroads and pipelines equally in its state constitution and its statutory definition of public utilities; Congress simply chose to favor railroads. 254 Kan. at 547.

CIG properly distinguishes *ANR Pipeline,* because Congress has not ordered preferential treatment of intracounty gas gathering pipelines in Kansas.

In this case, to the extent the statute is facially discriminatory against interstate commerce, it is imperfectly or incompletely so. Intercounty systems wholly contained within Kansas are taxed the same as interstate systems. Thus the Kansas tax does not necessarily exert pressure on interstate businesses to conduct more of their activities in the state.

CIG points out, however, that the Hellersteins have addressed the import of imperfection or incompleteness of discrimination on Commerce Clause analysis. They state:

"[I]f a tax favors certain in-state residents or interests while discriminating against many other in-state as well as out-of-state residents or interests, does it nevertheless violate the Commerce Clause?

"The U.S. Supreme Court has answered this question in the affirmative, although not specifically in the context of a state tax. In *Dean Milk Co. v. City of Madison,* [340 U.S. 349, 354, 95 L. Ed 329, 71 S. Ct. 295 (1950)] the Court struck down a Madison, Wisconsin, ordinance barring the sale of milk not processed within five miles of the city. The Court found it 'immaterial' that the ordinance discriminated equally against in-state milk processed outside the five-mile perimeter. The Court's position is consistent with its more recent pronouncements that there is no 'de minimis' defense to discrimination and that it need not know 'how unequal' a tax is 'before concluding that it unconstitutionally discriminates.' " 1 Hellerstein & Hellerstein, State Taxation, ¶ 4.13(1A), p. S 4-8 (3d ed. 2004 Supp.).

In *Dean Milk Co. v. Madison,* 340 U.S. 349, 354, 95 L. Ed. 329, 71 S. Ct. 295 (1951), the Supreme Court found the ordinance "erect[ed] an economic barrier protecting a major local industry against competition from without the State." The ban led to unjustified discrimination against interstate commerce, and the burden it produced exceeded any need to protect local health and safety; other "reasonable nondiscriminatory alternatives" were available, according to the Court. It simply did not matter that Wisconsin milk from outside the Madison area was subjected to

"the same proscription as that moving in interstate commerce." 340 U.S. at 354 n.4; *cf. Brimmer v. Rebman*, 138 U.S. 78, 83, 34 L. Ed. 862, 11 S. Ct. 213 (1891) (" 'a burden imposed by a State upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to the people of all the States, including the people of the State enacting such statute' ").

And, in the much more recent case of *Fulton Corp. v. Faulkner*, 516 U.S. 325, 133 L. Ed. 2d 796, 116 S. Ct. 848 (1996), the Supreme Court concluded that an "intangibles" tax facially discriminated against interstate commerce. The Court noted that the state secretary of revenue had argued the tax was so small in amount as to have no practical impact. This argument was explicitly rejected: "[W]e have never recognized a 'de minimus' defense to a charge of discriminatory taxation under the Commerce Clause." 516 U.S. at 333 n.3.

Other United States Supreme Court decisions have included similar pronouncements. See *Associated Industries of Mo. v. Lohman*, 511 U.S. 641, 650, 128 L. Ed. 2d 639, 114 S. Ct. 1815 (1994) ("[A]ctual discrimination, wherever it is found, is impermissible, and the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred."); *C & A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 391, 128 L. Ed. 2d 399, 114 S. Ct. 1677 (1994) (flow control ordinance "no less discriminatory because in-state or in-town processors are also covered by the prohibition"); *Maryland v. Louisiana*, 451 U.S. 725, 760, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981) ("We need not know how unequal the [t]ax is before concluding that it unconstitutionally discriminates.").

In view of these authorities, we have no hesitation in extending the rationale of the United States Supreme Court's *Dean Milk* decision to this state tax case.

Like the sales preference of *Dean Milk*, which facially discriminated against all milk producers outside a 5-mile radius of Madison, Wisconsin, the tax we examine here benefits only a part of an industry located completely within the state. Other intrastate entities in the same industry — in *Dean Milk*, producers outside the protected city and environs but within Wisconsin, here, intercounty

gas gathering systems within Kansas — are not benefitted. Put another way, there is no differential treatment of certain intrastate entities in comparison to entities in interstate commerce. But this imperfect discrimination is nevertheless discrimination. If there is no de minimis defense, we are compelled to conclude that the statute is facially discriminatory.

Even if we were to reach the opposite conclusion on the facial discrimination *Amerada Hess* factor, we would conclude the statute has the effect of unduly burdening interstate commerce. See *Amerada Hess*, 490 U.S. at 75. BOTA found that CIG paid approximately $900,000 more in taxes than it would have paid if it were an intra-county system. There is substantial competent evidence in the record to support this factual finding, and such an impact can hardly be characterized as de minimis or even minor. Our statute is not evenhanded, and its impact exceeds the merely incidental. *Cf. Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 472, 66 L. Ed. 2d 659, 101 S. Ct. 715 (1981); *Blue Sky Bar, Inc. v. Stratford*, 203 Conn. 14, 30, 523 A. 2d 467 (1987).

We note that Massachusetts and California courts also have concluded that specific tax statutes or ordinances facially discriminated against or had an effect of unduly burdening interstate commerce in circumstances where the discrimination might be described as imperfect or incomplete.

In an advisory opinion, the Massachusetts Supreme Judicial Court concluded that legislation reducing a surcharge on motor vehicle rental contracts from $10 to $3 only for residents of a city violated the Commerce Clause. The Massachusetts court concluded the surcharge discriminated against out-of-state consumers, and its constitutional flaw was not cured by the fact that it also discriminated against many in-state consumers. *Opinion of the Justices to the House of Representatives*, 428 Mass. 1201, 1208, 702 N.E.2d 8 (1998).

In *Union Oil Co. v. City of Los Angeles*, 79 Cal. App. 4th 383, 94 Cal. Rptr. 2d 81 (2000), the California court considered a challenge to a Los Angeles tax ordinance, concluding it directly discriminated "against interstate and intercity taxpayers doing business in the City. A Los Angeles business paying the payroll tax in

Los Angeles is exempt from the business license tax (L.A. Mun. Code, § 21.24), although the intercity or interstate business performing the same activity in the City must pay the business license tax." 79 Cal. App. 4th at 388-89; see also *General Motors Corp. v. City & County of San Francisco*, 69 Cal. App. 4th 448, 81 Cal. Rptr. 2d 544 (1999) (holding business tax that differentiated between in-city manufacturers and out-of-city manufacturers violated Commerce Clause); *General Motors Corp. v. City of Los Angeles*, 35 Cal. App. 4th 1736, 42 Cal. Rptr. 2d 430 (1995) (holding business tax that differentiated between in-city manufacturers and out-of-city manufacturers violated Commerce Clause), *abrogated on other grounds by Union Oil Co. of Cal. v. City of Los Angeles*, 79 Cal. App. 4th 383, 94 Cal. Rptr. 2d 81 (2000).

Both federal and state courts from many other jurisdictions have rejected assorted nontax measures on the basis of the *Dean Milk* rationale. See, *e.g.*, *Kentucky Power Co. v. Huelsmann*, 352 F. Supp. 2d 777, 785-86 (E.D. Ky. 2005) (electricity curtailment priority statute; "[T]he fact that some Kentucky customers are not within the favored class under [the law] does not change the constitutional analysis. Regulations that treat all out-of-staters in a disparate manner will be treated as discriminatory even though some in-staters are also adversely affected by the regulation."); *Lett v.Paymentech, Inc.*, 81 F. Supp. 2d 992, 999 (N.D. Cal. 1999) (statutes requiring contracts for commission-based sales employees lacking fixed place of business in California; "unreasonable burdens on interstate commerce cannot be saved by legislative enactments that also impose parallel burdens on intrastate commerce . . . . [T]he state's ability to regulate interstate commerce, circumscribed in the Constitution, is not enhanced or affected by its regulation of intrastate commerce."); *Connecticut Carting Co. v. Town of East Lyme*, 946 F. Supp. 152, 156 n.6 (D. Conn. 1995) (ordinance regulating waste collection and disposal; "The fact that the ordinance also increases the cost of doing business for in-state competing facilities . . . is immaterial, as regulations are no less discriminatory because in-state businesses are also discriminated against."); *Sanifill, Inc. v. Kandiyohi County*, 559 N.W.2d 111, 115 n.3 (Minn. App. 1997) (waste disposal fee ordinance; "The fact that intrastate

as well as interstate commerce may be adversely affected . . . is immaterial to the determination of whether [the measure] is discriminatory for Commerce Clause purposes."); *Homier Distrib. Co., v. City of Albany*, 90 N.Y.2d 153, 159, 659 N.Y.S.2d 223, 681 N.E.2d 390 (1997) (city transient retailer tax; discriminatory character of law "not altered because its burden may also fall upon some local businesses").

Because K.S.A. 79-5a01 is facially discriminatory and has the effect of unduly burdening interstate commerce under *Amerada Hess*, it discriminates under *Complete Auto*. We therefore hold that its differentiation between interstate and intercounty natural gas gathering systems on the one hand and intracounty systems on the other is unconstitutional under the federal Commerce Clause, and we must reverse BOTA's decision because of its reliance on the statute. See K.S.A. 77-621(c)(1).

### Equal Protection

CIG next argues that K.S.A. 79-5a01 violates the Equal Protection Clauses of the federal and state Constitutions. The Fourteenth Amendment to the United States Constitution guarantees equal protection of the laws, and the Kansas Constitution provides virtually the same protection. See *Colorado Interstate Gas Co. v. Beshears*, 271 Kan. 596, 609, 24 P.3d 113 (2001).

Because BOTA's decision must be reversed under the Commerce Clause analysis above, we need not reach the merits of this constitutional issue. We choose to address it, however, because of CIG's evident confusion about the appropriate level of scrutiny to be applied when equal protection challenges to state taxes reach the appellate courts and our desire to eliminate such confusion in future cases.

First, we note that we have previously stated:

"If similarly situated taxpayers receive disparate treatment, the one receiving the less favorable treatment may have been denied equal protection of the law even if the taxpayer receiving the less favorable tax is taxed according to the law. [Citation omitted.] However, the taxpayer seeking to establish a violation of the Equal Protection Clause must demonstrate that his or her treatment is the result of a 'deliberately adopted system' which results in intentional systematic unequal treat-

ment. [Citation omitted.]" *In re Tax Appeal of City of Wichita*, 274 Kan. 915, 920, 59 P.3d 336 (2002).

Even if we assume that CIG could show that its treatment was the result of a deliberately adopted system which results in intentional unequal treatment, which it cannot, it would not be entitled to relief under the Equal Protection Clause.

Federal and Kansas courts have long delineated three levels of scrutiny in equal protection cases: (1) the rational basis test to determine whether a statutory classification bears some reasonable relationship to a valid legislative purpose; (2) the heightened scrutiny test to determine whether a statutory classification substantially furthers a legitimate legislative purpose; and (3) the strict scrutiny test to determine whether a statutory classification is necessary to serve some compelling State interest. See *Bair v. Peck*, 248 Kan. 824, 830-31, 811 P.2d 1176 (1991).

PVD correctly recognizes the well-established rule that tax classifications such as the one before us need meet only the rational basis level of scrutiny to satisfy the Equal Protection Clause. *General Motors Corp. v. Tracy*, 519 U.S. 278, 311, 136 L. Ed. 2d 761, 117 S. Ct. 811 (1997). " '[I]n taxation, even more than in other fields, legislatures possess the greatest freedom in classification.' " *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, 253, 930 P.2d 1 (1996) (quoting *Madden v. Kentucky*, 309 U.S. 83, 88, 84 L. Ed. 590, 60 S. Ct. 406 [1940]).

CIG nevertheless attempts to persuade us that heightened or possibly strict scrutiny should be applied to our examination of K.S.A. 79-5a01, because the tax classification is "suspect." Heightened scrutiny applies to "quasi-suspect" classes. Only in cases involving strict scrutiny, applicable to "suspect classifications" or "fundamental interests," is the presumption of constitutionality shifted and the burden placed on the party asserting constitutionality to show a compelling state interest. *Farley v. Engelken*, 241 Kan. 663, 668-70, 740 P.2d 1058 (1987).

CIG's argument has no merit. Although strict scrutiny is mentioned in some of the cases cited by CIG, see *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 342-43, 119 L. Ed. 2d

121, 112 S. Ct. 2009 (1992); *Hughes v. Oklahoma*, 441 U.S. 322, 337, 60 L. Ed. 2d 250, 99 S. Ct. 1727 (1979); and *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4, 82 L. Ed. 1234, 58 S. Ct. 778 (1938), those cases deal with health and safety regulation under the Commerce Clause. They are not equal protection cases. Nothing in them dictates that we depart from precedent applying the rational basis test when taxation schemes come under equal protection challenge.

CIG also asserts in the alternative that, even if the rational basis test is applied, there is no valid purpose supporting the statute's differentiation between interstate and intercounty systems and intracounty systems. It implies that the Kansas tax classification is arbitrary and emphasizes that the BOTA majority saw no evidence of the existence of a rational basis for the statute. Although we note the BOTA majority's statement that "[n]o rational basis has been established in the evidentiary record," we discount it as an erroneous interpretation or application of the law. See K.S.A. 77-621(c)(4).

No evidence of a particular *actual* legitimate purpose in legislative history or elsewhere is necessary for an enactment to survive rational basis scrutiny. Rather, an appellate court is free to consider whether any potential legitimate purpose exists. See *Peden*, 261 Kan. at 259-60 (upholding tax rate disparity between single and married taxpayers). In this case, we can imagine several, but it is enough to say that PVD has pointed out one that is entirely sufficient: When K.S.A. 79-5a01 was enacted in 1969, the legislature may have intended, among other things, to divide appraisal duties between the PVD and county appraisers, a valid purpose for the statute's classification of interstate and intercounty systems as public utilities and its explicit exception of intrastate systems from that definition.

Once the correct level of scrutiny is applied to CIG's equal protection claim, the statute survives application of the rational basis test and CIG's claim fails.

Reversed and remanded for further proceedings consistent with this opinion.

GERNON, J., not participating.

LARSON, S.J., assigned.

DAVIS, J., dissenting: I respectfully dissent from the majority decision and conclude that the Board of Tax Appeals (BOTA) had no jurisdiction to make findings of fact regarding the constitutionality of K.S.A. 79-5a01.

BOTA is a specialized agency that exists to decide taxation issues. While assessment is a question of taxation, discriminatory assessment is not a tax question but rather a constitutional question. BOTA does not have the authority to decide the constitutionality of a statute. *Zarda v. State*, 250 Kan. 364, Syl. ¶ 3, 826 P.2d 1365, *cert. denied* 504 U.S. 973 (1992).

There was no disagreement between the parties on the valuation of taxpayer's property. Taxpayer contested the Department of Revenue's Director's assessment of its property but only insofar as its claim that the assessment under K.S.A. 79-5a01 was discriminatory and thus unconstitutional. After a lengthy hearing on the constitutional question, BOTA entered its findings of fact and conclusions of law regarding the constitutionality of K.S.A. 79-5a01and related statutes. However, BOTA then concluded in a short sentence: "[T]he Board must conclude that the Department's valuation and assessment on the Taxpayer's property in Kansas should be sustained in its entirety for all the years at issue herein." BOTA entered this conclusion for the stated reason that it had no jurisdiction over the constitutional question.

CIG successfully attacked the constitutionality of K.S.A. 79-5a01 before BOTA and this court, thereby obtaining a substantial refund for the years in question. BOTA identified the following issue to be resolved by its extensive proceedings:

"The issue before the Board is whether the valuation method and assessment rate as applied to the Taxpayer's Kansas cross county and interstate natural gas gathering properties under K.S.A. 79-5a01, when read in conjunction with K.S.A.

79-1439 and Article 11, Section 1 of the Kansas Constitution, result in discriminatory taxation of such properties *vis-a-vis* single county natural gas gathering system properties in violation of the Commerce Clause of the United States Constitution and the Equal Protection Clauses of the United States and Kansas Constitutions."

BOTA is to presume the constitutionality of all statutes involved in this controversy. That presumption in this case required BOTA to affirm the Department's assessment against the Taxpayer. Nevertheless, BOTA devoted the entire proceeding to a determination of whether the statute violated the United States and Kansas Constitutions. The entire proceeding before BOTA runs counter to the dictates of *Zarda*:

"Where there are no issues raised which lend themselves to administrative determination and the only issues present either require judicial determination or are subject to judicial de novo review, it follows that plaintiffs should be permitted to seek court relief without first presenting the case to the administrative agency." *Zarda*, 250 Kan. at 368-69.

The taxpayer attacked the constitutionality of the statutes in question. BOTA entertained the question. The record demonstrates from the prehearings through the final hearing and the findings of fact and conclusions of law that the purpose of the hearing was to determine whether the statutes involved discriminated against CIG with the result that the statutes violated the United States and Kansas Constitutions. In *Felten Truck Line v. State Board of Tax Appeals*, 183 Kan 287, 327 P.2d 836 (1958), this court said:

"The commission [BOTA] is not set up as a court to review the constitutionality of legislative enactments. It is an administrative body. It is the commission's duty to presume that the statutes are constitutional and valid. The plaintiffs had a right to seek court relief on the question of the constitutionality of the statute without first presenting the question to the commission for review."

BOTA did not presume the constitutionality of the taxing statute in question but allowed the parties to submit evidence on the discriminatory aspects of the statute as well as other constitutional issues. BOTA, recognizing its limitations, stopping short of declaring the statute unconstitutional, made the necessary findings of fact and conclusions of law that support the majority's determination

that the statute is unconstitutional. The entire constitutional question should have been submitted to and determined by the only body uniquely suited to initially determine constitutional questions—a court of law. I would therefore affirm BOTA's determination that the Director's valuation and assessment of CIG's property be sustained but otherwise dismiss, allowing CIG to pursue its question before a district court.

The majority notes that BOTA has no jurisdiction "to decide the constitutionality of a statute." In more recent cases where the constitutionality of a statute was before BOTA, there was a separate issue or issues giving BOTA jurisdiction. See, *e.g.*, *In re Tax Appeal Sprint Communications Co.*, 278 Kan. 690, 101 P.3d 1239 (2004); *In re Tax Appeal of ANR Pipeline Co.*, 276 Kan. 702, 79 P.3d 751 (2003); *In re Tax Appeal of Colorado Interstate Gas Co.*, 276 Kan. 672, 79 P.3d 770 (2003); *In re Tax Appeal of Lietz Constr. Co.*, 273 Kan. 890, 47 P.3d 1275 (2002); *In re Tax Appeal of Barton-Dobenin*, 269 Kan. 851, 9 P.3d 9 (2000); *In re Tax Appeal of Alsop Sand Co.*, 265 Kan. 510, 962 P.2d 435 (1998). In these cases, with the exception of one, our court has acknowledged that BOTA is without authority or jurisdiction to address constitutional questions. In each case, the constitutional question was not decided by BOTA and was resolved by this court as a matter of law. See also *In re Tax Appeal of Colorado Interstate Gas Co.*, 270 Kan. 303, 304-05, 14 P.3d 1099 (2000) (constitutional issues raised before BOTA were not ripe for determination by this court on appeal where BOTA had no authority over these issues).

In this case, BOTA addressed the sole question presented—the constitutionality of K.S.A. 79-5a01. BOTA found facts supporting the conclusion that the statute was unconstitutional instead of presuming the constitutionality of the statute. Without the facts and conclusions by BOTA, this court would not have been able to resolve the constitutional question as a matter of law. Without BOTA's findings and conclusions, the question of the constitutionality of K.S.A. 79-5a01 and related statutes involved mixed questions of fact and law, which are to be resolved by a district court.

In *Sprint Communications*, BOTA determined that while it did not have authority to declare a statute unconstitutional, it did have

authority to determine whether the Department's application of a statute was unconstitutional. Since this was not an issue in the case, we did not comment on BOTA's statement. I would submit that no Kansas case supports BOTA's assertion of jurisdiction. BOTA is an administrative agency without jurisdiction to consider the constitutionality of a statute. The conclusion that it may consider the application of the statue and determine its constitutionality as to the taxpayer is contrary to well-established law. BOTA must presume the constitutionality of the statute when it applies to the taxpayer.

For all the reasons set forth, the constitutionality of the statute in this case was a mixed question of fact and law. This court is not in a position to determine facts relating to the constitutionality of a statute. BOTA had no jurisdiction to consider the constitutionality of the statute. Thus, its findings and conclusions have no force or effect. I would therefore affirm BOTA's assessment and dismiss the remainder of the appeal so that the mixed questions of fact and law relating to the constitutionality of K.S.A. 79-5a01 and related statutes may be resolved by a court of competent jurisdiction—a district court.

ALLEGRUCCI, J., joins in the foregoing dissenting opinion.